1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   MICHAEL DOKTOREZTK,            )  Civil No. 09-CV-1288-JM(WVG)
                                    )
12                  Plaintiff,      )  **REPORT AND RECOMMENDATION ON**
                                    )  **DEFENDANT'S MOTION FOR SUMMARY**
13   v.                             )  **JUDGMENT**
                                    )
14   S. MORALES, ET AL.,            )  [DOC. NO. 28]
                                    )
15                  Defendants.     )
     _____)
16

17       Pending before the Court is Defendant S. Morales's Motion for

18   Summary Judgment.   (Doc. No. 28.)   Defendant claims qualified

19   immunity from suit and argues that he did not violate Plaintiff's

20   Eighth Amendment rights because he did not display deliberate

21   indifference for Plaintiff's safety.   The undersigned RECOMMENDS

22   that Defendant's motion be DENIED.

23                  **I.   FACTUAL BACKGROUND**[1/]

24       In August 2007, Plaintiff was a state prisoner incarcerated

25   at R. J. Donovan State Prison ("RJD") in San Diego, California.   On

26   August 27, 2007, plaintiff was escorted from his housing unit to the

27   _____

28   [1/]      The factual background is largely adapted from Defendant's motion.
             Much of the facts are not disputed.  Where facts are disputed, the
             undersigned will state so.

                                        1                    09CV1288

1    Triage Treatment Area ("TTA") for a medical appointment. (Doc. No.

2    28-4 at 16.)[2/]   The TTA building is a facility where licensed

3    physicians provide medical care to inmates, and contains offices,

4    treatment rooms, restrooms, and a holding cell.  (Id. at 33-34.)

5         Plaintiff was placed in the TTA holding cell while he waited

6    to be examined.  (Id. at 17.)  Plaintiff shared the holding cell

7    with several other inmates from the Sensitive Needs Yard ("SNY").

8    (Id. at 18.)  Plaintiff was an SNY inmate.  (Id. at 15.)  Inmates

9    are assigned to the SNY if they have serious safety concerns.  (Id.

10   at 34.)  Such inmates include those convicted of sex crimes against

11   children, those who have dropped out of gangs, and other inmates

12   with special security needs.  (Id.) SNY inmates are housed sepa-

13   rately from the vast majority of the prison's inmates, who do not

14   have the same serious security needs and can be housed in "general

15   population."   Various general population inmates were also waiting

16   for treatment and were seated on a bench, which was approximately

17   ten feet from the holding cell.  (Id. at 18-19, 33.)

18        Defendant Morales was a correctional officer assigned to the

19   TTA and was supervising inmates as they waited to be treated by the

20   physician. (Id. at 32.)  In 2007, Defendant had been a Correctional

21   Officer for approximately 21 years.  (Id.)

22        The TTA holding cell was approximately seven by five feet,

23   with benches inside, but no restroom.  (Id. at 33.)  The SNY inmates

24   had been waiting in the cell for approximately 90 minutes, and

25   several of them requested permission to use the restroom.  (Id. at

26

27

28

---

[2/]    All page numbers refer to the Court Clerk's numbering of the
document when filed, not the document's native pagination.

1 || 33.)  Defendant Morales granted their requests and allowed them to
2 || use the restroom one at a time.  (Id.)

3 ||        In order for the SNY inmates to use the restroom, they had to
4 || be let out of the holding cell and walk past the general population
5 || inmates who were seated on benches.  (Id. at 20-21, 33.)  Defendant
6 || escorted the SNY inmates individually and stood near the entrance to
7 || the restroom while they were inside.  (Id. at 33.)  Defendant avers
8 || that  approximately  five  SNY  inmates  used  the  restroom  without
9 || incident  before  Plaintiff  did  so.   (Id.)   However,  Plaintiff
10 || believes he was the third SNY inmate to use the restroom.  (Id. at
11 || 20.)  Plaintiff requested to be let out of the holding cell to use
12 || the restroom, but did not state he had any reservations about being
13 || let out of the cell.  (Id. at 21, 33.)  Moreover, Plaintiff did not
14 || request that the inmates from other units be cleared from the path
15 || until he was secured.  (Id.)  Nor did Plaintiff state that he had
16 || any  safety  concerns,  either  due  to  his  classification  as  an  SNY
17 || inmate, or because of an enemy situation or prior conflict with any
18 || of the general population inmates.  (Id. at 33.)

19 ||        As Plaintiff passed the general population inmates, they used
20 || derogatory language toward him.  (Id. at 22.)  However, Defendant
21 || avers  he  did  not  hear  the  general  population  inmates  make  the
22 || derogatory comments.  (Id. at 33.)  Defendant stood near the door to
23 || the restroom while Plaintiff was inside.  (Id. at 23.)

24 ||        Almost  immediately  after  Plaintiff  walked  out  of  the
25 || restroom, an inmate (later identified as Morales) stood up, yelled
26 || profanities  at  Plaintiff,  and  began  hitting  him  with  a  wooden
27 ||
28 ||

09CV1288

1   crutch.  (Id. at 23-24, 33-34.)  Another inmate (later identified as

2   Buenrosto) hit plaintiff with his fists in the head and torso area.

3   (Id. at 24, 34.)

4        Defendant was a few feet away from where the assault

5   transpired, and he immediately responded by activating his personal

6   alarm device and repeatedly ordering the inmates to stop, which they

7   ignored.  (Id. at 24-25, 34.)

8        Defendant then unholstered his pepper spray and sprayed a two

9   to three-second burst into the facial areas of inmates Morales and

10  Buenrosto.  (Id. at 25-26, 34.)  Simultaneously, another correc-

11  tional officer sprayed inmate Morales in the face with a two-second

12  burst of pepper spray.  (Id. at 34.)  As soon as the inmates were

13  sprayed, they stopped and got down prone on the floor.  (Id.)

14  Defendant maintained custody of the involved inmates until respond-

15  ing staff arrived and escorted them out of the area.  (Id.)

16       As Plaintiff recounted in his deposition, the entire incident

17  lasted approximately 10 to 20 seconds.  (Id. at 25.)  Plaintiff had

18  never met, or even seen, either of his attackers before the day of

19  the attack.  (Id. at 26.)

## II.  LEGAL STANDARD

21       Federal Rule of Civil Procedure 56(a) mandates the grant of

22  summary judgment "if the movant shows that there is no genuine

23  dispute as to any material fact and the movant is entitled to

24  judgment as a matter of law."  The standard for granting a motion

25  for summary judgment is essentially the same as for the granting of

26  a directed verdict.  Judgment must be entered "if, under the

27  governing law, there can be but one reasonable conclusion as to the

28  verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51

1    (1986).   However, "[i]f reasonable minds could differ," judgment

2    should not be entered in favor of the moving party.  Id.; see also

3    Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007)

4    ("If a rational trier of fact might resolve the issue in favor of

5    the nonmoving party, summary judgment must be denied.") (alteration

6    omitted).

7         The parties bear the same substantive burden of proof as

8    would apply at a trial on the merits, including plaintiff's burden

9    to establish any element essential to his case.  Anderson, 477 U.S.

10   at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Lack of

11   a genuine issue of material fact on a single element of a claim for

12   relief is sufficient to warrant summary judgment on that claim.

13   Celotex Corp., 477 U.S. at 322-23.

14        The moving party bears the initial burden of identifying the

15   elements of the claim in the pleadings, or other evidence, and

16   "'showing' -- that is, pointing out to the district court -- that

17   there is an absence of evidence to support the nonmoving party's

18   case."  Id. at 325; see also Fed. R. Civ. P. 56(c).  "A material

19   issue of fact is one that affects the outcome of the litigation and

20   requires a trial to resolve the parties' differing versions of the

21   truth."  S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir.

22   1982).

23        The burden then shifts to the nonmoving party to establish,

24   beyond the pleadings, that there is a genuine dispute for trial.

25   Celotex Corp., 477 U.S. at 324.  To successfully rebut a properly

26   supported motion for summary judgment, the nonmoving party "must

27   point to some facts in the record that demonstrate a genuine issue

28   of material fact and, with all reasonable inferences made in the

1  plaintiff[]'s favor, could convince a reasonable jury to find for

2  the plaintiff[]."   Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d

3  736, 738 (9th Cir. 2000) (citing Rule 56; Celotex Corp., 477 U.S. at

4  323; Anderson, 477 U.S. at 249).

5          "When opposing parties tell two different stories, one of

6  which is blatantly contradicted by the record, so that no reasonable

7  jury could believe it, a court should not adopt that version of the

8  facts for purposes of ruling on a motion for summary judgment."

9  Scott v. Harris, 550 U.S. 327, 380 (2007).

10                         **III.   DISCUSSION**

11 **A.      A Genuine Dispute Exists Whether Defendant Acted With
            Deliberate Indifference Toward Plaintiff's Safety**

12

13         The key issue is whether Defendant acted with deliberate

14 indifference toward Plaintiff's safety when he walked Plaintiff past

15 a bench that seated two general population prisoners.   Defendant

16 argues he did not so act because Plaintiff did not alert him of any

17 safety concerns, did not express discomfort with walking past the

18 general population inmates, Defendant was not aware of any specific

19 threats against Plaintiff, and Defendant had walked several other

20 inmates past the same bench without incident shortly before

21 Plaintiff was assaulted.   Plaintiff counters that the mere fact that

22 he was an SNY inmate put Defendant on notice that he was at high

23 risk of being assaulted, and that Defendant was deliberately

24 indifferent to this high risk and, as a result, Plaintiff's safety.

25         **1.   Legal Background**

26         "'Prison officials have a duty . . . to protect prisoners

27 from violence at the hands of other prisoners.'"   Farmer v. Brennan,

28 511   U.S.   825,   833   (1994)   (quoting   Cortes-Quinones   v.

                                     6                        09CV1288

1    Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988)).  The failure

2    of prison officials to protect inmates from attacks by other inmates

3    may rise to the level of an Eighth Amendment violation when:

4    (1) the deprivation alleged is "objectively, sufficiently serious"

5    and (2) the prison officials had a "sufficiently culpable state of

6    mind," acting with deliberate indifference.  Id. at 834 (internal

7    quotations omitted).  In the seminal Farmer case, the United States

8    Supreme Court for the first time defined the precise contours the

9    mental state required for deliberate indifference purposes.

10       Farmer was a male transsexual who "wore women's

11   clothing . . . , underwent estrogen therapy, received silicone

12   breast implants," and generally projected feminine characteristics.

13   Id. at 829.  Farmer was initially housed in administrative segrega-

14   tion but was reassigned to the federal prison's general population

15   without any objection from him.  Id. at 830.  Within two weeks,

16   Farmer's cell-mate beat and raped him, and he was returned to

17   administrative segregation.  Id.

18       Farmer sued various prison officials, alleging that the

19   officials (1) placed him in the violent prison and (2) assigned him

20   to general population "despite knowledge that the penitentiary had

21   a violent environment and a history of inmate assaults, and despite

22   the knowledge that [Farmer], as a transsexual who 'projects feminine

23   characteristics,' would be particularly vulnerable to sexual attack

24   by . . . inmates."  Id. at 831.  Farmer claimed this amounted to

25   deliberate indifference for his safety and a failure to protect him

26   in violation of his Eighth Amendment rights.  Id.

27       The district Court denied Farmer's motion for additional

28   discovery and granted the prison officials' summary judgment motion

1    because Farmer had not notified the officials of his safety

2    concerns.    Id. at 831-32.    The district court granted summary

3    judgment because it found that "[t]he failure of prison officials to

4    prevent inmate assaults violates the Eighth Amendment . . . only if

5    prison officials were 'reckless in a criminal sense,' meaning that

6    they had 'actual knowledge' of a potential danger."    Id. at 831.

7    Because Farmer "never expressed any concern for his safety to any"

8    official, they "had no knowledge of any potential danger to [Farmer

9    and] were not deliberately indifferent to his safety."    Id. at 832

10   (internal quotations and citation omitted).    The United States

11   Supreme Court granted *certiorari* after the Seventh Circuit Court of

12   Appeals summarily affirmed the district court's order without

13   opinion.    Id.    The Court took the case because appellate courts had

14   adopted inconsistent tests for "deliberate indifference."    Id.

15        The Court began by reaffirming that an Eighth Amendment

16   violation can lie for an official's failure to protect inmates from

17   violence.    "Prison conditions may be restrictive and even harsh, but

18   gratuitously allowing the beating or rape of one prisoner by another

19   serves no legitimate penological objective any more than it squares

20   with evolving standards of decency.    Being violently assaulted in

21   prison is simply not part of the penalty that criminal offenders pay

22   for their offenses against society."    Id. at 833-34 (internal

23   quotations and citations omitted).

24        The Court then turned to whether a prison official must have

25   actual knowledge of danger to an inmate (i.e., the subjective test)

26   or whether it is sufficient that he failed to "act in the face of an

27   unjustifiably high risk of harm that is either known or so obvious

28

8                                      09CV1288

1  that it should be know" (i.e., the objective test).  Id. at 836-37.

2  In adopting the more stringent subjective test, the Court held:

3          [A] prison official cannot be found liable under the
           Eighth Amendment for denying an inmate humane conditions
4          of confinement unless the official knows of and disregards
           an excessive risk to inmate health or safety; the official
5          must both be aware of facts from which the inference could
           be drawn that a substantial risk of serious harm exists,
6          and he must also draw the inference.

7  Id. at 837.  The Court thus held that the prison official must have

8  actual knowledge of the safety risk.  Importantly, "an official's

9  failure to alleviate a significant risk that he should have

10 perceived but did not . . . cannot under [Supreme Court precedent]

11 be condemned as the infliction of punishment."  Id. at 838 (emphasis

12 added).  Farmer thus mandated that Courts inquire into what each

13 official's state of mind actually was, rather than dictate what his

14 state of mind should have been.  In other words, what did this

15 official actually know?

16         As relevant to Plaintiff's case, the Court also discussed the

17 role that "obviousness" of a risk plays in the above analysis.

18 Although the Court held that the objective obviousness of a risk

19 (i.e., the official knew or should have known of the risk) was not

20 the proper measure of the deliberate indifference mental state,

21 obviousness was nonetheless relevant evidence for whether a specific

22 official subjectively knew of the risk.  As the Court explained:

23         Whether a prison official had the requisite knowledge
           of a substantial risk is a question of fact subject
24         to demonstration in the usual ways, including infer-
           ence from circumstantial evidence and a factfinder
25         may conclude that a prison official knew of a sub-
           stantial risk from the very fact that the risk was
26         obvious. . . .  For example, if an Eighth Amendment
           plaintiff presents evidence showing that a substan-
27         tial risk of inmate attacks was longstanding, perva-
           sive, well-documented, or expressly noted by prison
28         officials in the past, and the circumstances suggest
           that the defendant-official being sued had been

                                      9                           09CV1288

1         <u>exposed to information concerning the risk and thus</u>
        <u>"must have known" about it, then such evidence could</u>
2         <u>be sufficient to permit a trier of fact to find that</u>
        <u>the defendant-official had actual knowledge of the</u>
3         <u>risk.</u>

4 <u>Id.</u> at 842-43 (emphasis added; some quotations omitted).  Also as

5 relevant to the instant case, the Court further explained that

6 prison officials cannot claim ignorance that a particular inmate

7 would be attacked when that official has knowledge of the risk in

8 general:

9         Nor may a prison official escape liability for
       deliberate indifference by showing that, while he was
10        aware of an obvious, substantial risk to inmate safety,
       he did not know that the complainant was especially
11        likely to be assaulted by the specific prisoner who
       eventually committed the assault.  The question under
12        the Eighth Amendment is whether prison officials, acting
       with deliberate indifference, exposed a prisoner to a
13        sufficiently substantial "risk of serious damage to his
       future health," and it does not matter whether the risk
14        comes from a single source or multiple sources, any more
       than it matters whether a prisoner faces an excessive
15        risk of attack for reasons personal to him or because
       all prisoners in his situation face such a risk.  If,
16        for example, prison officials were aware that inmate
       "rape was so common and uncontrolled that some potential
17        victims dared not sleep [but] instead . . . would leave
       their beds and spend the night clinging to the bars
18        nearest the guards' station," it would obviously be
       irrelevant to liability that the officials could not
19        guess beforehand precisely who would attack whom.

20 <u>Id.</u> at 843 (citations omitted).  However, a trier of fact does not

21 have to conclusively accept that the obviousness of a risk automati-

22 cally means the prison official is liable.  The official may show

23 that he was justifiably unaware of the obvious risk:

24        Because, however, prison officials who lacked knowledge
       of a risk cannot be said to have inflicted punishment,
25        it remains open to the officials to prove that they were
       unaware even of an obvious risk to inmate health or
26        safety.  That a trier of fact may infer knowledge from
       the obvious, in other words, does not mean that it must
27        do so.  Prison officials charged with deliberate indif-
       ference might show, for example, that they did not know
28        of the underlying facts indicating a sufficiently
       substantial danger and that they were therefore unaware

09CV1288

1          of a danger, or that they knew the underlying facts but
         believed (albeit unsoundly) that the risk to which the
2          facts gave rise was insubstantial or nonexistent.

3 Id.

4      Applying the above principles, the Supreme Court reversed the

5 grant of summary judgment because the district court may have relied

6 too heavily on Farmer's failure to warn anyone of the risks he faced

7 in general population. Id. at 848. The Court reasoned:

8     That [Farmer] "never expressed any concern for his safety
    to any of [the officials]," was the only evidence the
9     District Court cited for its conclusion that there was no
    genuine dispute about respondents' assertion that they "had
10     no knowledge of any potential danger to [Farmer.]" But
    with respect to each of [Farmer's] claims, for damages and
11     for injunctive relief, the failure to give advance notice
    is not dispositive. [Farmer] may establish [the offi-
12     cials'] awareness by reliance on any relevant evidence.

13 Id. (citations omitted; citing to portion of the opinion regarding

14 evidence of obviousness of a risk).

15      **2.**   **A Genuine Dispute of Material Fact Exists**

16      Defendant argues that he is not liable because, *inter alia*,

17 Plaintiff failed to express any fear or concern about walking in

18 front of the general population inmates who sat on the bench next to

19 the SNY holding cell. However, as Farmer teaches, an inmate's

20 failure to warn a prison official does not exculpate the official if

21 he ignored known dangers and placed the inmate at risk. The proper

22 inquiry is whether Defendant subjectively knew of the risk that a

23 general population inmate might attack an SNY inmate despite not

24 being told of that danger.

25      Defendant does present some evidence that, based on his

26 subjective belief, he did not believe the aforementioned danger

27 existed. His most compelling fact is that five other SNY inmates

28 walked the same path to the restroom that Plaintiff walked without

1  being attacked.  Thus, because the two general population inmates

2  had not attacked those inmates, he did not believe they would attack

3  Plaintiff either.  Plaintiff only rejoins that two, not five,

4  inmates preceded him, but he does not dispute that other SNY inmates

5  walked in front of the same two general population inmates, who

6  attacked him, without incident.

7       For his part, Plaintiff presents some evidence, in the form

8  of a declaration from fellow SNY inmate Michael Douglas Taylor, who

9  avers that it is common knowledge among inmates and guards alike

10 that general population inmates attack SNY inmates when they have

11 the opportunity.  (Doc. No. 38 at ¶¶ 5(h), 5(o).)[3]  Indeed, Taylor

12 explains the "convict-code [sic]," which is a "standing-order [sic]

13 to assault any SNY-Inmate [sic] 'on-site,' [sic] and that <u>any</u>

14 general-population [sic] inmate who 'has the opportunity to assault

15 a[n] SNY-Inmate [sic]' and 'doesn't take the opportunity,' is then

16 to be assaulted."  (<u>Id.</u> at ¶ 5(o).)  Because of the dangers SNY

17 inmates faced, Taylor explains, all guards were "abundantly aware"

18 of the problem and the prison system had implemented special

19 procedures to protect SNY inmates as they were escorted between

20 different locations on prison grounds.  (<u>Id.</u> at ¶ 5(r) (explaining

21 that general population inmates were to either be cleared from the

22

23

_____

24  [3]    Defendant objects to the late filing of this declaration.  However,
         given that Plaintiff is representing himself <u>and</u> is currently in
25       custody, the undersigned recommends that Taylor's declaration be
         accepted despite its slightly untimely filing.  See <u>Erickson v.</u>
26  <u>Pardus</u>, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be
         liberally construed' . . . .") (per curiam) (quoting <u>Estelle v.</u>
27  <u>Gamble</u>, 429 U.S. 97, 106 (1976)) (internal citations omitted);
         <u>Corjasso v. Ayers</u>, 278 F.3d 874, 878 (9th Cir. 2002) ("Pro se habeas
         petitioners may not be held to the same technical standards as
28       litigants represented by counsel."); <u>Rand v. Rowland</u>, 154 F.3d 952,
         957 (9th Cir. 1998) (en banc) (explaining that courts "tolerate
         informalities from civil pro se litigants.").

1   area or compelled to sit on the ground until SNY inmates were

2   secured).)

3        At first blush, Defendant's argument seems reasonable. After

4   all, he had never met Plaintiff before and had no specific informa-

5   tion about Plaintiff's safety concerns or the seated general

6   population inmates' violence history.  Plaintiff also did not

7   express any concerns about his safety or about walking in front of

8   the general population inmates.  However, as explained above, the

9   Supreme Court has expressly rejected Defendant's contention that

10  Plaintiff should have alerted him of the danger.  Moreover,

11  Defendant never squarely addresses Plaintiff's most compelling

12  argument, that the mere fact that he was an SNY inmate alerted

13  Defendant of the risks attendant with walking him in close proximity

14  to general population inmates.  That argument, coupled with Taylor's

15  declaration explaining the "convict code," present a genuine dispute

16  of material fact.  As explained below, the undersigned cannot

17  conclude that Plaintiff has not presented any facts such that

18  Defendant is entitled to judgment as a matter of law.

19        Plaintiff's argument is that the risks to his safety were

20  obvious because everyone at the prison knew that general population

21  inmates attack SNY inmates on sight.  Thus, based on the obviousness

22  of this risk, he did not have to tell Defendant of the risk because

23  Defendant, along with everyone else, was well aware of it.  Had

24  Plaintiff been just another general population inmate, Defendant's

25  purported lack of knowledge of the danger would have been much more

26  reasonable and convincing.  Indeed, in that situation and without

27  more information, Defendant would have had no way of knowing that

28

1 | two general population inmates would have attacked another <u>general</u>
2 | <u>population</u> inmate.
3 |     While the undersigned recognizes that Plaintiff made no
4 | effort to inform Defendant of his safety concerns, his SNY status by
5 | itself spoke volumes.  SNY inmates are segregated from general
6 | population inmates because <u>significant</u> safety concerns require their
7 | segregation.  This is not an insignificant point that should be as
8 | easily overlooked as Defendant does.  The SNY population consists of
9 | gang drop-outs, child molesters, other sex offenders, and other
10 | inmates who are all at <u>serious</u> risk of <u>death</u> if housed in general
11 | population.  Plaintiff alleges that this is no secret to any inmate
12 | or corrections officer at any California prison, RJD included.  It
13 | is also no secret that there exists an informal standing rule that
14 | a general population inmate who encounters an SNY inmate must attack
15 | that inmate on sight.[4/]  This is simply part of the prison culture,
16 | which the prison continuously strives to decipher, analyze, and
17 | learn.  While it is inexplicable why the two inmates waited to
18 | attack Plaintiff, the fact remains that they did in fact attack
19 | Plaintiff in accordance with the standing rule.  Plaintiff had never
20 | met or even seen his attackers, yet they attacked him without any
21 | provocation whatsoever or any knowledge about him except that he was
22 | an SNY inmate.  The attackers' actions are certainly consistent with
23 | the existence of such a standing rule and bolsters why Plaintiff was
24 | SNY inmates must be kept separate from general population inmates in
25 | the first place.  Plaintiff's *pro se* pleadings, read liberally,
26 | demonstrate that a genuine dispute of fact exists whether Defendant
27 | acted with deliberate indifference because he subjectively knew of
28 |

[4/] Defendant does not dispute that this informal standing rule exists.

14     09CV1288

1 │ the risks of walking an SNY inmate in front of two general popula-

2 │ tion inmates.  As <u>Farmer</u> teaches, whether Defendant had knowledge of

3 │ the risk is a question of fact "subject to demonstration in the

4 │ usual ways," which includes evidence of the obviousness of the risk.

5 │ <u>Farmer</u>, 511 U.S. at 842.  The "standing rule" is precisely that kind

6 │ of evidence.

7 │      The foregoing notwithstanding, a rational trier of fact

8 │ could, of course, give full weight to Defendant's argument that he

9 │ did not subjectively believe Plaintiff was in danger because several

10 │ SNY inmates preceded Plaintiff without incident and because he did

11 │ not believe Plaintiff would be attacked in Defendant's presence.

12 │ After all, Defendant was a uniformed correctional officer.  However,

13 │ this evidence is not so compelling, and the "standing rule" evidence

14 │ is not so unbelievable or contradictory, that a trier of fact could

15 │ <u>only</u> come to the conclusion that Defendant subjectively believed

16 │ Plaintiff was safe.

17 │      Based on the foregoing, the undersigned cannot conclude that

18 │ Defendant has presented evidence so compelling that reasonable minds

19 │ could not differ whether he possessed the requisite mental state and

20 │ displayed deliberate indifference toward Plaintiff's safety.

21 │ Because a rational trier of fact could reasonably resolve this issue

22 │ in favor of Plaintiff, Defendant is not entitled to summary

23 │ judgment.  <u>See</u> <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 470 (9th

24 │ Cir. 2007) ("If a rational trier of fact might resolve the issue in

25 │ favor of the nonmoving party, summary judgment must be denied.")

26 │ (alteration omitted).

27 │

28 │

1    **B.    <u>Defendant is Not Entitled to Qualified Immunity</u>**

2         Defendant claims he is entitled to summary judgment because

3    he is immune from suit.  For the reasons that follow, the under-

4    signed concludes that he is not entitled to qualified immunity.

5         In considering a claim for qualified immunity, the Court

6    engages in a two-part inquiry:  whether the facts shown "make out a

7    violation of a constitutional right," and "whether the right at

8    issue was 'clearly established' at the time of defendant's alleged

9    misconduct."  <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815-16 (2009).

10        The undersigned first concludes that the facts in this case

11   make out a violation of a constitutional right.  It has long been

12   established that prison officials have a duty to keep inmates safe,

13   in particular to protect them from each other, and the failure to do

14   so is a violation of the Eighth Amendment.  <u>Farmer</u>, 511 U.S. at 832-

15   33.  As the United States Supreme Court wrote in 1994, "the lower

16   courts have uniformly held, and as we have assumed, [that] 'prison

17   officials have a duty . . . to protect prisoners from violence at

18   the hands of other prisoners.'"  <u>Id.</u> at 833 (citing cases; citation

19   omitted).  If Defendant disregarded the known risk that Plaintiff

20   would be attacked, walked him in front of the unsecured general

21   population inmates, exposed him to the known risk of attack, and

22   Plaintiff was in fact attacked, Defendant unjustifiably failed to

23   safeguard Plaintiff from attack, and an Eighth Amendment violation

24   is made out.

25        The undersigned turns to whether the constitutional right

26   that would be violated was clearly established.  This is "a two-part

27   inquiry: (1) Was the law governing the state official's conduct

28   clearly established? (2) Under that law could a reasonable state

1  official have believed his conduct was lawful?" <u>Browning v. Vernon</u>,

2  44 F.3d 818, 822 (9th Cir. 1995).  As previously explained, the

3  United States Supreme Court, the final arbiter of all constitutional

4  law questions, has long held that failure to safeguard an inmate's

5  safety is a violation of the Eighth Amendment.  <u>See</u> <u>Farmer</u>, 511 U.S.

6  at 858 ("The opinion's clear message is that prison officials must

7  fulfill their affirmative duty under the Constitution to prevent

8  inmate assault . . . or otherwise face a serious risk of being held

9  liable for damages . . . .") (Blackmun, J., concurring).  The right

10 was clearly established.

11       Next, "assuming the facts in the injured party's favor,"

12 <u>Estate of Ford</u>, 301 F.3d 1043, 1045 (9th Cir. 2002), had Defendant

13 known of the danger of walking an SNY inmate in close proximity to

14 two unsecured general population inmates, no doubt exists that a

15 reasonable officer would have known that Plaintiff was entitled to

16 his safety and to be free from attack at the hands of other

17 prisoners.  Defendant's assertion to the contrary notwithstanding,

18 it could not have been more clear to Defendant, or any reasonable

19 officer, that failing to protect Plaintiff from attack in this

20 situation was unlawful.[5]

21

22 _____

23 [5]    Defendant argues that the line between "some" risk and a
       "substantial" risk is unclear.  However, if there exists a standing
       order that general population inmates are to assault SNY inmates on
24     sight, lest they themselves be attacked, any reasonable officer
       would believe that the risk here did not straddle the fine line
       between "some" and "substantial," but rather, the risk was far on
25     the side of "substantial."  Otherwise, SNY inmates would not need to
       be kept in completely segregated housing in the first place.  The
26     instant case is distinguishable from <u>Estate of Ford</u>, 301 F.3d 1043
       (9th Cir. 2002), which involved assigning two mentally ill inmates
       in the same cell, where one ended up killing the other.   <u>Ford</u>
27     involved two inmates who could have been assigned to the same cell,
       but where the judgment to place the two particular inmates in the
28     same cell was misguided and unfortunate.  However, the instant case
       involves inmates in classifications that should not have been in
       contact with each other to begin with.

**III.   CONCLUSION**

Based on the foregoing, the undersigned RECOMMENDS that Defendant's Motion for Summary Judgment be DENIED.

This report and recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. Section 636(b)(1).

IT IS ORDERED that no later than February 11, 2011, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than March 11, 2011.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  January 28, 2011

_____
Hon. William V. Gallo
U.S. Magistrate Judge

18                                      09CV1288